```
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF MISSOURI
                  EASTERN DIVISION
```

VERONICA GARRETT,                )
                                 )
         Plaintiff,              )
                                 )
     v.                          )     No. 4:10 CV 2084 DDN
                                 )
MICHAEL J. ASTRUE,               )
Commissioner of Social Security, )
                                 )
         Defendant.              )

## MEMORANDUM

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the applications of plaintiff Veronica Garrett for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423, and for supplemental security income under Title XVI of that Act, 42 U.S.C. § 1382. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the court reverses and remands the decision of the defendant Commissioner.

## I. BACKGROUND

Plaintiff, who was born in 1970, filed her applications on May 4, 2008, alleging she has been disabled since November 13, 2007. She alleged disability due to a herniated disc, hypertension, migraine headaches, and asthma. (Tr. 159.) Her claims were denied initially, on reconsideration, and after a hearing before an ALJ. (Tr. 9-19. 58-59, 61-65.) On September 2, 2010, the Appeals Council denied her request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

On November 15, 2007, plaintiff saw Kevin Rutz, M.D., an orthopaedic spine specialist, for back pain. She reported a history of back pain that began seven months earlier when she suddenly experienced pain across her back while in a grocery store. At the time of her appointment with

Dr. Rutz, she was unable to sit longer than an hour due to her pain. Her prior treatment had included manipulations and acupuncture, but without significant improvement. She was taking Vicodin, a narcotic pain reliever. X-rays of her lumbar spine showed moderate to severe disc degeneration at L5-S1.[1] Dr. Rutz's impression was chronic low back pain, degenerative disc disease (DDD),[2] and intermittent left leg weakness. An MRI was scheduled. (Tr. 189-91.)

An MRI taken November 20, 2007 revealed degenerative changes in her lower lumbar spine, more prominent at L4-5 and L5-S1 where there was some mild disc bulging and facet changes with bilateral narrowing at both of these levels. The narrowing was worse at L5-S1, but there was no definite root impingement, although this would be difficult to completely exclude. (Tr. 192.)

On November 30, 2007, plaintiff complained that a Fentanyl patch, a narcotic used to relieve moderate to severe ongoing pain, had caused drowsiness and dizziness. Although the patch helped relieve her pain, she complained of continued dizziness when rising from a lying or sitting position. On December 3, 2007, she stated that she had removed the patch because it made her feel sick. (Tr. 308.)

On January 7, 2008, plaintiff saw Gregory Stynowick, M.D., a pain specialist, for a consultation. (Tr. 293-94.) Her pain was 8/10 on a numeric rating scale and she was in mild distress due to her pain.

---

[1] The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (C1-C7), twelve thoracic vertebrae (T1-T12), five lumbar vertebrae (L1-L5), five sacral vertebrae (S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back. The sacrum is immediately below the lumbar vertebrae. Stedman's Medical Dictionary Plate 18 A18 (28th ed. 2006).

[2] Degenerative disk disease refers to the normal changes that occur in the spinal disks as a result of aging. These changes can produce neck and back pain, as well as osteoarthritis, herniated disks, and spinal stenosis (the narrowing of the spinal canal). WebMD http://www.webmd.com/back- pain/tc/degenerative-disc-(last visited July 15, 2011).

Straight leg raise (SLR), an objective test to screen for nerve root irritation, was negative.  She was prescribed Norco, a combination narcotic and non narcotic used to relieve moderate to severe pain.  Dr. Stynowick suggested a lumbar epidural steroid injection (ESI).[3]  (Tr. 293-94.)

In January 18, 2008 correspondence, a medical director at Express Scripts wrote Dr. Stynowick to confirm that he had been prescribing multiple and large quantities of addictive substances for plaintiff. (Tr. 282.)

On February 7, 2008, Dr. Stynowick noted that plaintiff reported a 95% reduction in pain following two ESIs.  She had decreased her medication to once daily and was "exceptionally satisfied" with her result.  (Tr. 279.)  On March 27, 2008, a discogram, an enhanced x-ray of the intervertebral disks, showed lumbar DDD.  (Tr. 270-71.)

On April 10, 2008, plaintiff saw Daniel Scodary, M.D., a surgeon at North County Neurosurgery for a consultation regarding spinal fusion surgery.  On physical exam, plaintiff appeared completely normal with the exception of increasing pain at 80 degrees of flexion and 5 degrees of extension.  An MRI indicated she had multilevel DDD.  (Tr. 269.) Plaintiff smoked one-half pack of cigarettes per day.  (Tr. 393.)  She was 5' 10" tall and weighed 296 pounds.  (Tr. 190.)  Dr. Scodary

---

[3]An epidural steroid injection (ESI) is a combination of a corticosteroid with a local anesthetic pain relief medicine.  ESIs sometimes are used to treat pain and inflammation from pressure on the spinal cord.  ESI is usually not tried unless symptoms caused by lumbar spinal stenosis have not responded to other nonsurgical treatment.  An ESI may be tried when other nonsurgical treatments have failed to relieve severe leg pain from lumbar spinal stenosis.  Lumbar spinal stenosis may cause pain that radiates from the lower spine to the hips or down a leg. ESIs are used for leg pain rather than back pain from lumbar spinal stenosis. WEbMD http://webmd.com/back/pain/epidural-steroid-injections-for-lumbar-spinal-stenosis (last visited July 25, 2011).

Steroid injections can help relieve pain for a short time (2 to 3 weeks) in some people.  Experts do not know how well injections work over longer periods of time.  Some people get enough pain relief that they can delay or no longer need surgery.  These injections may relieve symptoms and reduce inflammation but do not cure spinal stenosis. (Id.)

counseled her about the difficulty of three-level-anterior lumbar fusion surgery because of her weight, as well as the "evils" of spinal fusion and tobacco use.  (Tr. 269, 394.)

On May 16, 2008, after having failed a conservative course of physical therapy and pain management, Dr. Scodary performed three-level anterior lumbar fusion surgery at L3-S1, a bone marrow augmentation, and insertion of a stabilization plate.  (Tr. 389-94.)  Within 24 hours of surgery, plaintiff began ambulating well.  She was instructed to follow up in two weeks and was expected to have a "superb" outcome.  X-rays following surgery showed the instrumentation to be in good position.  (Tr. 389-90.)

On July 17, 2008, one month post surgery, Victor Washborn, titled as "medical consultant," completed a Physical Residual Functional Capacity (RFC) Assessment.  He opined that plaintiff had the ability to occasionally lift/carry 20 pounds and frequently lift and carry 10 pounds.  She could stand and/or walk about 6 hours in an 8-hour workday and sit about 6 hours in an 8-hour workday.  (Tr. 395-400.)

On July 21, 2008, Dr. Scodary again referred plaintiff to Dr. Stynowick for pain control.  In correspondence, Dr. Scodary stated that although plaintiff was walking three quarters of a mile per day and had lost 28 pounds, she was still having difficulties with managing her pain.  At that time she was taking Vicodin and Tramadol.  Dr. Scodary described plaintiff's current x-rays as "fantastic."  (Tr. 752.)

Following her surgery, plaintiff was referred to physical therapy for range of motion (ROM), strength, and pain control.  On July 29, 2008, after four visits, she was discharged due to absences in therapy and hypersensitivity to exercise and ROM while in therapy.  Her physical therapy goals had not been met.  (Tr. 587.)

On September 5, 2008, Anne-Marie Puricelli, M.D., conducted an independent medical examination at the request of plaintiff's employer, AmerenUE.  Plaintiff reported that she had quit smoking.  Dr. Puricelli observed a slightly painful and unsteady gait and observed that plaintiff's legs appeared to be weak and shaky upon movement after the exam.  Dr. Puricelli opined that plaintiff was not then capable of performing the duties of her normal position as a customer contact

representative. She imposed restrictions, including limited sitting and standing, no more than 20 minutes at a time with the ability to recline when needed; limited walking; and no stairs or driving. Dr. Puricelli did not foresee plaintiff's restrictions would be permanent. (Tr. 442-43.)

On October 6, 2008, Dr. Stynowick diagnosed lumbar post-laminectomy syndrome or failed back syndrome, and DDD. He noted positive SLR bilaterally, decreased ROM of plaintiff's lumbar spine, and her use of a cane. He increased her MS Contin, an oral morphine used to relieve moderate to severe pain.[4] (Tr. 735.) On October 27 and November 25, 2008, Dr. Stynowick again diagnosed lumbar post-laminectomy syndrome, DDD, and lumbar radiculopathy. He noted positive SLR bilaterally. On October 27, he increased her MS Contin, as well as Oxycodone, a narcotic used for moderate to severe pain. On November 25, he refilled her MS Contin and Oxycodone. (Tr. 733-34.)

On December 1, 2008, plaintiff's former employer approved her claim for Long Term Disability. (Tr. 404-08.) On December 18, 2008, Dr. Stynowick diagnosed lumbar post-laminectomy syndrome, DDD, and lumbar radiculopathy, noting positive SLR bilaterally and unstable gait. He refilled her Oxycontin, as well as her Dilaudid, a hydromorphone used to relieve moderate to severe pain. (Tr. 724, 732.)

On December 22, 2008, Dr. Scodary wrote Dr. Stynowick:

> Although Veronica's flexion and extension x-rays look good and she is neurologically intact, I am afraid to say she just has not had a very fulfilling outcome from her anterior fusion. As you know, three-level anterior disc disease is somewhat controversial as was expressed to her preoperatively. She has scheduled with you a spinal stimulator[5] and has achieved her disability.

---

[4]Throughout her treatment, plaintiff has been prescribed morphine, in the form of MS Contin; Fentanyl patches; Oxycodone; Oxycontin; and Dilaudid. (Tr. 715, 719-22, 724, 726, 732-35.)

[5]Spinal cord stimulation (SCS) is a procedure that uses an electrical current to treat chronic pain. A small pulse generator, implanted in the back, sends electrical pulses to the spinal cord. These pulses interfere with the nerve impulses that make a person feel pain. This treatment may be done for people with severe, chronic pain who have

> Other than very nice stable flexion and extension x-rays, I cannot say that we have made a marked improvement in this woman's qualify of life. Hopefully, the stimulator will.

(Tr. 730.)

On January 15, 2009, plaintiff underwent spinal cord stimulation (SCS). (Tr. 728-29.) The operative report states that she tolerated the procedure well and was able to ambulate without difficulty following the procedure. (Tr. 728.) On February 9, 2009, Dr. Stynowick discontinued plaintiff's MS Contin because she reported it no longer controlled the pain. He added Oxycontin and refilled Dilaudid. (Tr. 726.)

On March 9, 2009, Dr. Stynowick diagnosed lumbar post-laminectomy syndrome, DDD, and lumbar radiculitis or inflammation of the nerve roots. He noted positive SLR and an unstable gait. (Tr. 725.) Plaintiff underwent lumbar ESIs twice in April 2008, three times in September 2008, and on September 8, 2009. (Tr. 715-17, 723, 736-39.) She continued to see Dr. Stynwick from April through September 2009. (Tr. 719-22, 724.) He noted positive SLR on several visits, an unsteady gate, and plaintiff's use of a cane. (Tr. 715, 719-222, 724-26, 732-35.) On April 28 and June 16, 2009, Dr. Stynowick increased her Oxycontin and refilled her Dilaudid. (Tr. 720-722.)

On June 18, 2009, plaintiff saw Janet Isbell, LCSW, for depression and anxiety. Notes from the visit state:

> She does not feel that she knows her function in life. Veronica worked sometimes in the past, sixteen hours a day. Now all she can do is [lay] around in pain . . . The pain is 40% better than it used to be, but it still limits her function. Veronica's qualify of life has been diminished. . . . She is currently taking Oxycodine for the pain, Dilatan for muscle relaxation and Celexa for her depression . . . She appeared to be much older than her actual age. Stress from the illness could account for some of the aged appearance.

---

failed back surgery syndrome, severe nerve-related pain or numbness, and chronic pain syndromes, such as complex regional pain syndrome. WEbMD http://www.webmd.com/back-pain/spinal-cord-stimulation-for-low-back-pain, (last visited July 26, 2011.)

(Tr. 711.)  Plaintiff and the social worker talked about plaintiff finding a new meaning for her life, and she was given some mindfulness exercises.  (<u>Id.</u>)

**Testimony at the Hearing**

On November 24, 2009, plaintiff appeared and testified to the following at a hearing before an ALJ.  (Tr. 25-57.)  She has past work as a customer service representative, receptionist, and telemarketer.  (Tr. 33-36.)  She has hypertension and takes medicine for it.  She was diagnosed with asthma in 1999 but it is "not really that bad." (Tr. 39.)  She controls her asthma with an inhaler that she uses only as needed, once or twice a week.  (Tr. 39-40.)  She has headaches at least twice a week.  (Tr. 41.)  She takes Oxycontin and Dilaudid for pain.  (Tr. 41-42.)

She can drive a car, but it is painful.  She lives in a house with her children who do the cooking and household chores.  Neighborhood boys do her yard work.  She can walk three to five minutes before needing to rest; stand for five minutes; and sit for ten minutes or less.  (Tr. 42-43.)  She watches movies by laying on her side in  bed.  (Tr. 44-45.)  She can lift about two pounds.  She quit smoking following her spinal fusion surgery.  (Tr. 44-45.)  SCS did not work and was very painful.  (Tr. 46.)

She is unable to return to her work as a customer service representative because she cannot sit for periods of time as required by the position.  Lying down is the only thing that helps relieve the pain.  She checks her email only about once a month because it is too painful to sit and do it.  She uses an electric cart in the grocery store.  (Tr. 48.)  Although they have not helped relieve her pain, she has had about five lumbar ESIs since her fusion surgery.  (Tr. 49-50.)

Vocational Expert (VE) Dolores Gonzalez also testified at the hearing.  (Tr. 66-90.)  She testified about plaintiff's vocational history which included work as a customer service representative, item processor at a bank, telemarketer, accounts payable clerk, and receptionist.  The VE testified that plaintiff had transferable clerical,

bookkeeping, and customer service skills from prior employment. (Tr. 53.)

The ALJ asked the VE to assume a hypothetical person with plaintiff's education, training, and work experience who could lift 20 pounds occasionally, ten pounds frequently, stand and walk six out of eight hours, and sit six out of eight hours. The individual would have to avoid concentrated exposure to fumes, dust, odors, and gas, as well as concentrated exposure to vibrations and hazardous machinery and hazards of heights. She could climb stairs and ramps occasionally; never climb stairs and ramps; occasionally climb kneel and crouch; and never crawl. The VE testified that such an individual would be able to perform all plaintiff's past relevant work. (Tr. 53-54.)

The ALJ asked the VE a second hypothetical which was the same as the first, except with the additional requirement that the individual have a sit/stand option at the work site with the ability to change positions frequently. The VE testified that the individual could perform the telemarketer job with a headset, as well as cashier and ticket taker, both of which were light and unskilled. (Tr. 54.)

The ALJ asked the VE a third hypothetical that also required a sit/stand option, but that was limited to sedentary work. The VE testified that the telemarketer job was sedentary, as was information clerk and order clerk.

In a fourth hypothetical, the ALJ added further limitations as to the sit/stand limitation such that the individual could walk only three to five minutes at a time; stand only five minutes at a time; sit only ten minutes at a time; and lift about eight pounds. The VE testified that no jobs would be available under that hypothetical.

### III.   DECISION OF THE ALJ

On January 16, 2010, the ALJ issued an unfavorable decision. (Tr. 9-18.) At Step One, the ALJ found plaintiff had not engaged in substantial gainful activity since November 13, 2007, her alleged onset date. (Tr. 11.) At Step Two, the ALJ found plaintiff had the severe impairments of hypertension, disorder of the back (L3-S1 fusion), obesity, and hypothyroidism. The ALJ found plaintiff had the non-severe

impairment of depression. (Id.)  At Step Three, the ALJ found plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (Tr. 12.)

At Step Four, the ALJ found plaintiff had the RFC to perform light work, which is characterized by the ability to lift/carry 20 pounds occasionally and 10 pounds frequently.  She must have a sit/stand option at the work site with an ability to change positions frequently.  She can occasionally climb stairs and ramps, and occasionally stoop, kneel and crouch.  She can never climb ropes, ladders and scaffolds and never crawl.  Plaintiff must avoid concentrated exposure to fumes, odors, dust, and gases and avoid concentrated exposure to vibrations and hazards of machinery and hazards of heights.  (Tr. 13.)  The ALJ found plaintiff could perform her past work. (Tr. 18.)  The ALJ also considered Step Five of the sequential evaluation and found that plaintiff had transferable skills such that she could perform other work that existed in significant numbers in the national economy.  Accordingly, the ALJ found plaintiff was not disabled.  (Tr. 18-19.)

## IV.   GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically

determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009).  A five-step regulatory framework is used to determine whether an individual qualifies for disability.  20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d at 942.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Id.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her PRW.  Id.  The claimant bears the burden of demonstrating she is no longer able to return to her PRW.  Id.  If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

## V. DISCUSSION

Plaintiff argues the ALJ erred in determining her RFC because there is no record evidence to support the conclusion that she has the RFC to perform light work.  In support, she argues that no treating or examining source opined that she is capable of light work.  She argues that if the ALJ gave considerable weight to the opinion of Dr. Puricelli in reaching his decision, then the ALJ should have found her incapable of even sedentary work with the restriction of the need to recline when needed.  She also argues that if the ALJ gave considerable weight to the state agency consultant, who is not a medical consultant, then the ALJ erred because he weighed the opinion of a lay person under the standards for the opinion of a medical consultant.

In response, the Commissioner responds that the ALJ did not rely exclusively on the assessment of the state agency disability examiner.

With respect to RFC, the Commissioner echoes the ALJ's analysis. The Commissioner contends that in formulating RFC, the ALJ gave considerable weight to plaintiff's treating and examining physicians, none of whom had placed long term restrictions on plaintiff. He also considered her therapist's records in determining the severity of her impairment and how it affected her ability to work, while recognizing that the therapist's opinion could not be afforded controlling weight because it was not from an "acceptable medical source." (Tr. 15, 18.) The Commissioner also contends that an "abundance" of objective medical evidence supports the ALJ's RFC, specifically noting "relatively normal physical examinations and good relief with treatment of medication and ESIs." (Tr. 14-16.)

This court agrees with plaintiff. RFC is a medical question and the ALJ's determination of RFC must be supported by substantial evidence in the record. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). RFC is what a claimant can do despite his limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and a claimant's description of his limitations. Donahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001); 20 C.F.R. § 416.945(a). While the ALJ is not restricted to medical evidence alone in evaluating RFC, the ALJ is required to consider at least some evidence from a medical professional. Lauer, 245 F.3d at 704.

At Step Four, the ALJ found that plaintiff has the RFC to perform light work. She could lift and/or carry 20 pounds occasionally and 10 pounds frequently. She must have a sit/stand option at the work site with an ability to change positions frequently. She can occasionally climb stairs and ramps and occasionally stoop, kneel, and crouch. She can never climb ropes, ladders, and scaffolds, and never crawl. Plaintiff must avoid concentrated exposure to fumes, odors, dust, and gases and avoid concentrated exposure to vibrations and hazards of machinery and hazards of heights. (Tr. 13.)

In reaching his finding, the ALJ stated, "[a]s for the opinion evidence, considerable weight is afforded to the claimant's treating and examining physician, none of whom placed long-term restrictions on the

claimant, and the State agency consultant.  The therapist's records are being considered to help determine the severity of the claimant's impairment and how it affects her ability to work." (Tr. 17-18.)  The ALJ also stated:

> The medical records do not document that any treating physician has ever found or imposed any long term, significant and adverse mental or physical limitations upon the claimant's functional capacity.  There is no medical evidence that the claimant has required prolonged hospitalizations since the alleged onset date of November 13, 2007.  There is no reason the claimant cannot lift and carry up to twenty pounds and work at a job with a sit/stand option throughout an eight-hour workday.  Her allegations to the contrary are not consistent with the evidence as a whole, persuasive or credible.

(Tr. 16.)

First, to the extent the ALJ relied on the opinion of Victor Washburn, who is not a medical consultant, this was error.  State agency consultant Washburn is titled "Disability Examiner-DDS," "Disability Examiner," and "Counselor" throughout the record. (Tr. 59-60, 183.)  The Commissioner does not dispute that Mr. Washburn is not a medical consultant.  Nor is there any clear indication that the ALJ knew this RFC Assessment was completed by a lay person.  Here, Mr. Washburn's typed name in the box marked "medical consultant" is ambiguous because the signature block is marked for a medical consultant.  See Dewey v. Astrue, 509 F.3d 447, 449-50 (8th Cir. 2007) (remanding for rehearing where administrative decision revealed that the ALJ inadvertently relied on the opinion of a person without medical credentials as a medical consultant; finding that no substantial evidence that the RFC Assessment in the record was the opinion of a physician).

As to RFC, following a review of the evidence, this court concludes substantial evidence on the record as a whole does not support the ALJ's RFC finding.  Contrary to the Commissioner's assertions, this court concludes the unequivocal record evidence demonstrates plaintiff's impairments did not improve with treatment.  The Commissioner states that within a few months following her spinal fusion surgery, plaintiff was walking three-quarters of a mile each day and was doing "wonderfully."

(Tr. 15, 387, 752.)  However, that statement is taken out of context. Two weeks post surgery, Dr. Scodary opined that plaintiff's "incision has healed nicely and other than a little bit of right sided lower back pain, she has done wonderfully."  (Tr. 387.)  And in July 2008, two months post-surgery, Dr. Scodary referred her to pain specialist Dr. Stynowicki for assistance in pain control. (Tr. 752.)  In later correspondence, Dr. Scodary stated that he was still having difficulties with managing plaintiff's pain even though she was walking three quarters of a mile per day and had lost 28 pounds.  At that time she was taking Vicodin and Tramadol.

    Moreover, following her fusion surgery, plaintiff underwent multiple lumbar ESIs to control pain.  (Tr. 15, 738.)  Dr. Scodary opined, "I am afraid to say she just has not had a very fulfilling outcome from her anterior fusion" and "other than very nice stable flexion and extension x-rays, I cannot say that we have made a marked improvement in this woman's qualify of life."  (Tr. 730.)  Thus, while the SCS <u>procedure</u> itself was successful, the record indicates that SCS was not effective in controlling her pain.  (Tr. 46.)

    In June 2009, one year post surgery, while plaintiff reported to a social worker that her pain was 40% better than it used to be, her quality of life was still diminished and she was still taking Morphine and other narcotics for pain.  (Tr. 15, 711.)

    In sum, the record evidence demonstrates plaintiff underwent three-level fusion--which her surgeon described as unsuccessful--followed by multiple lumbar ESIs, and SCS placement.  The ESIs and SCS were also unsuccessful in relieving her pain.  She was seen by a pain specialist and prescribed Morphine and other narcotics throughout her relevant period.  Her impairments generally did not improve with treatment.  Based on all of the above, this court concludes substantial evidence on the record as a whole does not support the ALJ's conclusion that plaintiff has the RFC to perform light work.

    Plaintiff also argues the ALJ erred in assessing her credibility because he failed to address her medications, their side effects, and Dr. Stynowick's numerous modifications thereto in an attempt to control her

- 13 -

pain.  This court agrees.  Because remand is appropriate, the ALJ should also reconsider plaintiff's credibility at the rehearing.

## VI.  CONCLUSION

For the reasons set forth above, the court finds that the decision of the ALJ is not supported by substantial evidence on the record and is inconsistent with the Regulations and applicable law.  The decision of the Commissioner of Social Security is reversed and remanded for rehearing.  An appropriate Judgment Order is issued herewith.

/S/   David D. Noce<br>
**UNITED STATES MAGISTRATE JUDGE**

Signed on December 2, 2011.